

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00159-CR

TYSON JAMES NOLEN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
TRIAL COURT NO. CR12626

----------

### MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Tyson James Nolen of continuous sexual abuse of a child and assessed his punishment at confinement in the penitentiary for fifty-four years. *See* Tex. Penal Code Ann. § 21.02 (West Supp. 2016). In his first issue, Appellant contends he received ineffective assistance of counsel. In his second issue, he contends that the admission of extraneous offenses under section 2(b) of article 38.37 of the code of criminal procedure violated the constitutional prohibition against ex post facto laws. We affirm.

---
[1]*See* Tex. R. App. P. 47.4.

**BACKGROUND**

Appellant was a teacher whom the State alleged had committed the offense of continuous sexual abuse of a child from about November 1, 2012, through March 15, 2013; the complainant was one of Appellant's students, a thirteen-year-old girl at the time of the alleged offense. Pursuant to article 38.37 of the code of criminal procedure, in addition to evidence pertinent to the complainant, the State, during the trial on guilt/innocence, also introduced evidence that Appellant had sexually abused another of his students, a girl who at the time was sixteen years old. *See* Tex. Code Crim. Proc. Ann. art. 38.37 (West Supp. 2016). The jury found Appellant guilty of the offense as charged in the indictment.

During the punishment trial, the State introduced evidence of a third female student of Appellant's that he had sexually abused. The jury assessed his punishment at imprisonment for fifty-four years in the penitentiary. The trial court sentenced him accordingly.

**FIRST ISSUE:  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

Appellant contends that defense counsel rendered ineffective assistance at trial in three respects. First, he alleges that defense counsel failed to investigate the circumstances of the offense. Second, he asserts that defense counsel failed to retain an expert witness. Third, Appellant maintains that defense counsel failed to object to the seating arrangement of the spectators at his trial.

**Standard of Review**

Because Appellant claimed ineffective assistance of counsel as part of his motion for new trial and he received a hearing on his motion, our task is to determine whether the trial court erred in denying that motion. *See Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012); *Dotson v. State*, No. 04-14-00285-CR, 2015 WL 4273582, at *3 (Tex. App.—San Antonio July 15, 2015, pet. ref'd) (mem. op., not designated for publication)*.* Accordingly, we use the abuse of discretion standard of review applicable to denials of motions for new trial. *Riley*, 378 S.W.3d at 457. This standard requires us to show great deference to the trial court; we reverse only if the trial court's decision was clearly erroneous and arbitrary. *Id.* An "appellate court must not substitute its own judgment for that of the trial court and must uphold the trial court's ruling if it is within the zone of reasonable disagreement." *Id.* As to determinations of fact, we must view the evidence in the light most favorable to the trial court's ruling; a trial court abuses its discretion only if no reasonable view of the evidence could support its holding. *Id.* at 457–58.

To establish ineffective assistance of counsel, Appellant must show by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). An ineffective-assistance claim must be "firmly founded in the

3

record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). In evaluating the effectiveness of counsel under the deficient-performance prong, we look to the totality of the representation and the particular circumstances of each case. *Id.* The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

The prejudice prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, Appellant must show there is a reasonable probability that, without the deficient performance, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2070.

## Failure to Investigate

Regarding the failure to investigate, Appellant complains that defense counsel did not visit the school or the copy room at the school where one of the alleged acts occurred. Appellant also complains that defense counsel did not view the attendance records or class schedules of the alleged victims. Finally, Appellant complains that defense counsel did not interview the principal.

Appellant stresses that during the hearing on his motion for new trial, Dr. Sharon Miller, the director of the L5 Ace program at the school, testified that she was shocked that anyone would think that an offense could occur in the copy room. She said the copy room had a window five feet wide and three feet tall through which anyone could see. Dr. Miller's office was next to the copy room, and she said that there was always someone in her office. The copy room itself was in the main hub of the school, and directly across from the copy room were bathrooms. Because of the visibility and the daily use of the copy room, Dr. Miller thought that it was highly unlikely that anything happened in the copy room. Dr. Miller testified that in thirteen years, she had never seen the door to the copy room closed.

She also testified that she had never seen the door to Appellant's classroom closed and that she had made a point to tell teachers, especially male teachers, to leave their doors open. She said that she would "stick [her] head" into his room to make sure everything was okay, and she would see both Appellant and his students at their desks.

At the hearing on the motion for new trial, defense counsel testified that he did not visit the school. Defense counsel received the State's entire file. He said visiting the school would have been a waste of time. During trial, the State introduced numerous photographs of the copy room, the hallways, and Appellant's classroom.

State's Exhibits 14 through 19 show the copy room. State's Exhibit 14 shows the hallway entrance into the copy room and the large window that Dr. Miller mentioned in her testimony. However, State's Exhibit 15 shows that the door did not lead directly into the copy room but, instead, into an anteroom.

At the back of the anteroom are two doors. To the far right is a door, and to the far left is another door that leads to the copy room. Consequently, the large window in the hallway gives a direct view to the anteroom but only an indirect view to the rooms behind the anteroom.

The two doors at the back of the anteroom have tall, narrow windows. The narrow windows on both doors are partially obstructed by various ornaments.

The door to the far right of the anteroom is aligned with the hallway door. In the photograph, that door on the far right is closed, but if it were opened, it would appear to offer a view to the full depth of the room behind it.

In contrast, even when left fully open as shown in the photograph, because of the angle, the far left door—the one leading to the copy room—offers only a limited view into the copy room itself and does not offer a view of the full depth of the copy room unless one is standing within the doorframe itself.

6

State's Exhibits 17 and 18 show that the copy room is deep and narrow. The copier is located at the deepest part of the room.

State's Exhibit 19 shows that when standing at the very back of the copy room near the copier and looking towards the door leading into the anteroom, one cannot see the large window in the anteroom. All one can see is the wall to the right of the large window. Consequently, because one cannot see the hallway from the deepest part of the copy room, it would follow that the converse would be true too, that is, that from the hallway, one could not see the far end of the copy room.

The complainant testified that Appellant asked her to make copies and accompanied her into the copy room. Once inside the room, the complainant said that she "knew something was going to happen again" because Appellant walked out to make "sure no one was coming" and then "came back in." Appellant then put his hand down her pants in the copy room.

State's Exhibits 22, 23, 24, and 25 show that the door to Appellant's classroom was not flush with the wall but protruded several feet into the classroom, leaving a shallow alcove along the wall that Appellant's classroom shared with the hallway. Appellant's desk was at the far end of the alcove, the farthest distance away from the door. From the photos, it is clear that no one from the hallway could see Appellant's desk unless the person walked through the door into the classroom and looked to the immediate right into the alcove. The sixteen-year-old student testified that even if someone looked through the

7

window in the door into Appellant's classroom, Appellant's desk was not visible. The photographs show that even if Appellant had left the classroom door open, it would not have been possible to see his desk from the hallway. Appellant admitted to detectives that he and the sixteen-year-old engaged in sexual activity in his classroom and that he left the door to his classroom ajar at an angle that prevented anyone walking by from seeing them.

Nothing in the record shows that the photographs admitted at trial were not part of the State's file that defense counsel viewed. We hold that the trial court did not abuse its discretion by finding defense counsel's decision not to visit the school reasonable. *See Riley*, 378 S.W.3d at 457–58; *see also Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307.

Regarding interviewing the school principal and obtaining and reviewing the various school records, the principal testified at the hearing on the motion for new trial. He testified that defense counsel had never contacted him or, to his knowledge, come to the school. The principal thought it would have been important for defense counsel to come out to the school and request the nurse's records regarding the girls, the girls' class schedules, and their attendance records. He acknowledged that some of the records, although he was not sure which ones, were turned over to the State pursuant to grand jury subpoenas. The principal testified that he had no knowledge of what was going on with the girls because, if he had known, he would have put a stop to it. The principal thought it was possible that a sexual assault could have occurred in the copy

8

room. He acknowledged that nothing in the records being discussed showed Appellant did not commit the crime.

The principal's testimony shows that he knew nothing exculpatory about the various offenses.[2] We hold that the trial court did not abuse its discretion by finding defense counsel's failure to talk to the principal reasonable. *See Riley*, 378 S.W.3d at 457–58; *see also Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307.

Regarding the school records, the principal acknowledged that they contained nothing exculpatory. The principal's testimony also showed that some of school's records were turned over to the State. Defense counsel's testimony established that the State turned over its file to him. Although Appellant speculates that the school records might have been helpful, he does not give any concrete example of how they would have been helpful. Appellant bore the burden of persuasion. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Nava*, 415 S.W.3d at 307. We hold that the trial court did not abuse its discretion by finding that defense counsel's failure to independently obtain the school records was reasonable. *See Riley*, 378 S.W.3d at 457–58; *see also Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307.

---

[2]When the principal heard rumors about the sixteen-year-old's possible sexual involvement with Appellant, he confronted her. At trial, she admitted lying to the principal to protect Appellant. The principal punished her with four days of in-school suspension.

**Failure to Retain Expert Witness**

Appellant complains that defense counsel acknowledged that there were forensic psychologists who could interview an accused, determine if the accused was a danger to reoffend, and offer their opinion to the jury. Appellant contends that defense counsel acknowledged that such an opinion could be helpful to the jury. He complains that defense counsel even acknowledged using "out of town" experts in Hood County in the past. Appellant attached to his original motion for new trial the affidavit of Dr. Anna Shursen in which she asserted that he was a low danger to reoffend. Because such evidence was available, Appellant contends that defense counsel was ineffective by not presenting it to the jury.

At the hearing on the motion for new trial, defense counsel explained that—far from being mitigating evidence—such evidence, in the context of Appellant's case, risked alienating the jury and aggravating Appellant's sentence. Defense counsel and Appellant's current counsel engaged in the following exchange at the hearing:

> [Defense counsel:] Just because the report or the opinion would be favorable does not mean that that would garner you favor with a jury. When you bring a suit from out of town to testify in front of a local Hood County jury, with the facts in this case and the allegations as egregious as they were, when you bring somebody in here and -- and look them in the eye and say, "He's not dangerous," you run the risk of losing all your credibility with the jury . . . .
>
> It's not as simple as just because you get a favorable report, that automatically should have been done because that would have been in his best interest with the jury. In this county, where I've been practicing for 19 years, board certified in criminal law since 2004, I kind of know how far to the right some of these people are, and I know a little bit about the pulse of the county, and I made a

10

decision not to walk a so-called expert from the metroplex in a suit up here in front of that jury and tell them he's not dangerous.

[Appellant's current counsel:]  Well, but that would be up to a jury to make that determination if they want --

A  No.

Q  Excuse me -- if they want to believe that expert.

A  That's up to them whether or not they want to believe it.  It's up to me whether or not to even put it front of them and potentially tick them off.

Q  Well, that could have also helped him get a heck of a lot lesser sentence than 56 years.

A  It could have, or it could have been life.

Defense counsel stated that he had used experts in other cases—"Ones with different facts."  Defense counsel also expressed reservations about what such an expert witness's cross-examination might produce in terms of the effects of sexual abuse on victims, such as the potential for suicide, drug use, and sexually acting out.

Defense counsel's failure to call witnesses at the guilt and punishment stages cannot justify reversal on a claim of ineffective assistance absent showings that such witnesses were available and that Appellant would have benefitted from their testimony.  See King v. State, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); Garza v. State, 298 S.W.3d 837, 842 (Tex. App.—Amarillo 2009, no pet.).  Nothing in Dr. Shursen's affidavit indicated she would have been available to testify during Appellant's trial.

11

Dr. Shursen herself did not testify, and her affidavit was not admitted as evidence at the hearing. Although the trial court took judicial notice of the affidavit, this was inadequate. *See Stephenson v. State*, 494 S.W.2d 900, 909–10 (Tex. Crim. App. 1973). We have held that when a defendant is alleging ineffective assistance of counsel via an affidavit, a court may take judicial notice of the existence of the affidavit in its file, but "the court may not take judicial notice of the truth of the factual contents contained in such an affidavit because those facts are not the kinds of facts that a court may judicially notice." *Jackson v. State*, 139 S.W.3d 7, 21 (Tex. App.—Fort Worth 2004, pet. ref'd).

On this record, the trial court had several bases upon which to reject Appellant's argument. The trial court was within its discretion to find that defense counsel's decision not to call an expert was reasonable under all the circumstances. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307. Appellant failed to show that Dr. Shursen was available to testify during his trial. *See King*, 649 S.W.2d at 44; *Garza*, 298 S.W.3d at 842. And Appellant failed to introduce Dr. Shursen's affidavit into evidence. *See Stephenson*, 494 S.W.2d at 909–10; *Jackson*, 139 S.W.3d at 21. We hold that the trial court did not abuse its discretion by denying Appellant's motion for new trial on these bases. *See Riley*, 378 S.W.3d at 457–58.

## The Seating Arrangement

At the hearing on the motion for new trial, Appellant's brother testified that everyone was required to sit behind the prosecutor's table and no one was

allowed to sit behind defense counsel's table despite there being room for spectators to sit behind Appellant. Appellant's brother testified that there had not been any disruption warranting vacating the rows behind Appellant. Appellant's stepmother tried to sit behind Appellant's table, but a deputy instructed her to move to the prosecution's side. Appellant contends that the seating arrangement was obviously prejudicial because it implied that he had no family or friends on his side and that the whole courtroom sided with the prosecution.

Seating in the courtroom is within the trial court's discretion. *Williams v. State*, 155 Tex. Crim. 370, 376, 235 S.W.2d 166, 169 (1950). A defendant must object to test this discretion. *Shaver v. State*, 165 Tex. Crim. 276, 278, 306 S.W.2d 128, 130, *cert. denied*, 355 U.S. 864 (1957); *Musgrove v. State*, 425 S.W.3d 601, 607–08 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Defense counsel did not object.

During the hearing on the motion for new trial, defense counsel did not testify regarding the seating arrangement and his failure to object to it. Defense counsel mentioned that during one of the bond violation hearings, there was an outburst by one of Appellant's family members. Defense counsel added, "I think it was [Appellant's] brother." Defense counsel was not aware of any disruptions from the people in the gallery during the trial itself. Defense added, "Of course, I've got my back to [the gallery]." Defense counsel testified that there may have been comments about people making facial expressions, but he said that happened at almost every trial.

13

Direct appeal is usually an inadequate vehicle for raising an ineffective-assistance-of-counsel claim because the record is generally undeveloped. *Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012); *Thompson*, 9 S.W.3d at 813–14. It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record or when counsel's reasons for failing to do something do not appear in the record. *Menefield*, 363 S.W.3d at 593; *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel is not given that opportunity, we should not conclude that counsel's performance was deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308.

Although Appellant's brother testified regarding the seating arrangement at the hearing on the motion for new trial, Appellant's current counsel did not ask defense counsel why he did not object. On this record, without defense counsel's explanations, we cannot say that defense counsel's failure to object to the seating was so outrageous that no competent attorney would have failed to object. *See id.*

Additionally, Appellant's complaint is not firmly founded in the record. *See Thompson*, 9 S.W.3d at 813. To the extent defense counsel's testimony can be construed to suggest that he did not notice anything out of the ordinary in the

14

seating arrangement, that would suggest there was nothing out of the ordinary about the seating, thereby casting some doubt on the accuracy of Appellant's brother's testimony.

Defense counsel indicated that there was an outburst at an earlier bond hearing that he thought had been caused by Appellant's brother. The record was not developed whether the seating arrangement had anything to do with the earlier disruption at the bond hearing.

Additionally, the only person to testify regarding the seating arrangement was Appellant's brother. At the hearing on the motion for new trial, Appellant's brother was at the center of another factual dispute in which he and another witness gave conflicting testimony. One of the juror's testified that Appellant's brother approached her on the day Appellant was sentenced. The juror and Appellant's brother gave different versions of what happened during their conversation.

The juror denied telling Appellant's brother that a person close to her had been a victim of sexual abuse. The juror explained, "He was sitting up there, throwing a bunch of questions at me, and why we did this and why we did that, and I told him we were thinking of the girls." She described Appellant's brother as "spitting [questions] out one right after another." She said that was all she told Appellant's brother because she no longer wanted to talk to him. She said she talked to Appellant's brother "[f]or just a couple of seconds." She denied telling him that a person close to her had been a victim of sexual abuse.

15

Appellant's brother admitted talking to that juror on the day of sentencing. He maintained that she told him that a person close to her had been a victim of sexual abuse as a child and that thereafter this person continued to experience fear, especially after the man was released from prison. He also maintained that the juror told him that she shared this information with the other jurors, after which the other jurors agreed to think about the girls and give Appellant a longer sentence.

Although the dispute between Appellant's brother and the juror had nothing to do with the seating arrangement, it may have adversely impacted Appellant's brother's credibility on other matters, such as his testimony regarding the seating arrangement. His and the juror's testimony diverged greatly, and the trial court did not grant Appellant a new trial based upon any alleged misconduct by the juror.

Other than Appellant's brother's testimony regarding the seating arrangements, there was no other evidence. The trial judge never commented on what his orders were regarding the seating arrangements, if any, and no bailiffs were called to testify regarding their understanding of the trial court's instructions on seating arrangements at the trial. As noted earlier, Appellant's current counsel did not even ask defense counsel any questions specifically about the seating arrangements. Apart from Appellant's brother's testimony, the record is conspicuously quiet. On this record, we cannot conclude that the trial

16

court abused its discretion by denying Appellant's motion for new trial on this basis. *See Riley*, 378 S.W.3d at 457–58.

We overrule Appellant's first issue.

## SECOND ISSUE: EX POST FACTO

In his second issue, Appellant argues that the admission of extraneous offenses under section 2(b) of article 38.37 of the code of criminal procedure violated the constitutional prohibition against ex post facto laws. U.S. Const. art. I, § 9, cl. 3; Tex. Const. art. I, § 16. Notwithstanding rules 404 and 405 of the rules of evidence, section 2(b) of article 38.37 provides that, "evidence that the defendant has committed a separate offense . . . may be admitted in the trial . . . for any bearing [it] has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. Ann. art. 38.37, § 2(b). This particular section of article 38.37 became effective on September 1, 2013. Act of May 17, 2013, 83d Leg., R.S., ch. 387, § 3, 2013 Tex. Sess. Law Serv. 1168, 1169 (West) (codified at Tex. Code Crim. Proc. art. 38.37). Appellant committed the alleged offense of continuous sexual abuse of a child between November 1, 2012 and March 15, 2013, and his trial began in December 2013.[3] Accordingly, Appellant's argument is that because he allegedly committed the offense before the statute became

---

[3]Regarding the delay between Appellant's trial and this appeal, Appellant is proceeding after obtaining an out-of-time appeal. *See Ex parte Nolen*, No. WR-82,665-01, 2015 WL 514726, at *1 (Tex. Crim. App. Feb. 4, 2015) (not designated for publication).

17

effective, application of the statute to him violated the prohibition against ex post facto laws.

An ex post facto law is any law that (1) punishes as a crime any act that was innocent when it was performed; (2) inflicts a greater punishment than the law attached to a criminal offense when it was committed; (3) deprives the defendant of any defense available at the time the act was committed; or (4) alters the legal rules of evidence and requires less or different testimony than the law required at the time of the commission of the offense to convict the defendant. *See Carmell v. Texas*, 529 U.S. 513, 522, 120 S. Ct. 1620, 1627 (2000); *Pomier v. State*, 326 S.W.3d 373, 387 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Appellant's case turns on an evaluation of the fourth category— changes to the rules of evidence. *See Dominguez v. State*, 467 S.W.3d 521, 526 (Tex. App.—San Antonio 2015, pet. ref'd).

Section 2(b) of article 38.37 allows testimony regarding other extraneous offenses to show character conformity. *Baez v. State*, 486 S.W.3d 592, 600 (Tex. App.—San Antonio 2015, pet. ref'd), *cert. denied*, 137 U.S. 303 (2016); *Dominguez*, 467 S.W.3d at 526. The statute changes neither the State's burden of proof nor lessens the amount of evidence required to sustain a conviction. *Baez*, 486 S.W.3d at 600; *Dominguez*, 467 S.W.3d at 526; *see McCulloch v. State*, 39 S.W.3d 678, 683–84 (Tex. App.—Beaumont 2001, pet. ref'd). Both before and after the enactment of article 38.37, the quantum of evidence remains the same. No element is eliminated from the offense to be proved; and the

amount or measure of proof necessary for conviction is not reduced, altered, or lessened. *Baez*, 486 S.W.3d at 600; *McCulloch*, 39 S.W.3d at 684. Notwithstanding rules of evidence 404 and 405, the statute simply provides that a specific type of evidence will be admissible on certain relevant matters. *Baez*, 486 S.W.3d at 600; *McCulloch*, 39 S.W.3d at 684. The statute enlarges the scope of admissible testimony but leaves untouched the amount or degree of proof required for conviction. *Baez*, 486 S.W.3d at 600; *McCulloch*, 39 S.W.3d at 684. Article 38.37 eliminates the necessity of showing the evidence falls within one of the exceptions to rule 404(b). In that sense, it relaxes the strictures associated with rule 404(b); however, in no way does it alter the quantum of proof required by law to support the conviction. *Baez*, 486 S.W.3d at 600; *McCulloch*, 39 S.W.3d at 684.

We overrule Appellant's second issue.

## CONCLUSION

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 22, 2016